# D's EX 1

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

GREG E. LINDBERG,
Plaintiff,

v. Case No. 26-CA-003158

ALANA SAAD, an individual;
ALL RISE FILMS, a business entity;
CENTER DRIVE MEDIA, a business entity;
RAW TV LIMITED d/b/a RAW, a business entity;
GEORGIA INGLES, an individual;
OLIVIA MOLINA, an individual;
Defendants.
_____________________________________________/

## FIRST AMENDED COMPLAINT

Plaintiff GREG E. LINDBERG ("Plaintiff" or "Mr. Lindberg"), appearing pro se, sues Defendants ALANA SAAD ("Saad"), ALL RISE FILMS ("All Rise"), CENTER DRIVE MEDIA ("Center Drive"), RAW TV LIMITED d/b/a RAW ("Raw"), GEORGIA INGLES ("Ingles"), and OLIVIA MOLINA ("Molina") (collectively, "Defendants"), and alleges:

## PARTIES

1. Plaintiff Greg E. Lindberg at all times relevant to this action was a resident of Hillsborough County, a citizen and resident of Florida, and sui juris. He is an entrepreneur, philanthropist, and author who founded Global Growth, an investment firm with more than 120 portfolio companies and 7,500 employees worldwide.

2. Defendant Alana Saad ("Saad") is an individual who, upon information and belief, is a citizen and resident of Illinois, residing in the Greater Chicago Area, and who also maintains professional operations in Los Angeles, California. Saad describes herself as an "Emmy-winning documentary producer" who has produced documentary films and series for Netflix, Hulu, HBO, Apple, Paramount+, and other major streaming platforms.

3. Defendant All Rise Films ("All Rise") is, upon information and belief, a business entity with its registered address at 1200 18th Street NW, Suite 700, Washington, DC 20036.

All Rise was founded in 2004 by Jeff Zimbalist and describes itself as an Academy Award-shortlisted, multi-Emmy, DuPont, and Peabody Award-winning media company specializing in premium documentary storytelling for Netflix, Universal, HBO, Apple, CBS, ESPN, Paramount+, and other networks and streamers.

4. Defendant Center Drive Media ("Center Drive") is, upon information and belief, a business entity headquartered at 6701 Center Drive West, Suite 300, Los Angeles, California 90045. Center Drive owns and operates two production companies: Triage Entertainment, founded in 1995, and Lando Entertainment, founded in 2016, which have collectively produced over 4,000 hours of premium, prime-time programming distributed in over 100 countries. Upon information and belief, the CEO of Center Drive is Stu Schreiberg.

5. Upon information and belief, Triage Entertainment, a subsidiary of Center Drive, was the production company on prior documentary collaborations between Zimbalist and Saad, establishing a pattern of coordinated production activity among the U.S.-based Production Defendants.

6. Defendant Raw TV Limited d/b/a Raw ("Raw") is, upon information and belief, a British documentary and non-fiction television production company operating under the internet domain raw.co.uk. Raw publicly represents that it has "strong relationships with the top U.S. streamers" and actively markets its documentary output to United States audiences, including audiences in Florida, through global streaming platforms accessible in Florida. Raw produces documentary programming for U.S. streaming platforms including Netflix, Hulu, HBO, Apple, Paramount+, and Amazon Prime Video.

7. Defendant Georgia Ingles ("Ingles") is, upon information and belief, an individual employed by or acting as an agent of Raw, using the email address georgia.ingles@raw.co.uk. Ingles serves as a documentary producer for Raw and, as set forth below, has personally solicited Defendant Molina to participate in a documentary project concerning Mr. Lindberg's family and confidential arrangements with egg donors and gestational carriers.

8. Defendant Olivia Molina ("Molina") is a natural person over the age of eighteen who, upon information and belief, currently resides in Málaga, Spain. Molina is the mother of five children with Mr. Lindberg and was previously in a personal relationship with Mr. Lindberg from approximately 2019 through 2024. During that relationship, Molina gained access to highly confidential and sensitive information concerning Mr. Lindberg's business operations, personal communications with his legal and management teams, and details regarding his family planning decisions, including the identities of egg donors and gestational carriers.

9. Molina executed a Revised Relationship Agreement dated November 12, 2023 (the "Relationship Agreement"), which created express confidentiality obligations regarding information she obtained during her relationship with Mr. Lindberg.

10. Defendants Saad, All Rise, Center Drive, Raw, and Ingles are collectively referred to herein as the "Production Defendants."

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to Article V, Section 5(b) of the Florida Constitution and Section 26.012, Florida Statutes, as the amount in controversy exceeds Fifty Thousand Dollars ($50,000.00), exclusive of interest, costs, and attorney's fees.

12. This Court has personal jurisdiction over each Defendant pursuant to Florida's long-arm statute, Section 48.193, Florida Statutes, as set forth more fully below.

13. Venue is proper in Hillsborough County pursuant to Florida Statutes, because the Plaintiff resides in Hillsborough County and a substantial part of the events giving rise to this action occurred in Hillsborough County.

## JURISDICTIONAL ALLEGATIONS

### *Jurisdiction Over the U.S.-Based Production Defendants (Saad, All Rise, and Center Drive)*

14. This Court has personal jurisdiction over Defendants Saad, All Rise, and Center Drive under Section 48.193(1)(a)(2), Florida Statutes, which provides that a person, whether or

not a resident of Florida, submits to the jurisdiction of Florida courts for any cause of action arising from "committing a tortious act within this state."

15. Under Florida law, a defendant need not be physically present in the state to commit a tortious act "within" Florida. As the Florida Supreme Court held in Wendt v. Horowitz, 822 So. 2d 1252, 1260 (Fla. 2002), for purposes of Section 48.193(1)(a)(2), a nonresident may commit a tortious act in Florida through telephonic, electronic, or written communications directed into the state, so long as the asserted cause of action arises from those communications.

16. The District Courts of Appeal have consistently applied this principle. In Becker v. Hooshmand, 841 So. 2d 561 (Fla. 4th DCA 2003), the court reaffirmed that a defendant's physical presence is not required to commit a tortious act in Florida when communications into the state give rise to the cause of action.

17. A nonresident defendant can commit a tortious act in Florida under the long-arm statute by making written, telephonic, or electronic communications into Florida, if the cause of action alleged arises from those communications.

18. Here, Defendants Saad, All Rise, and Center Drive have engaged in a sustained course of telephonic, electronic, and written communications directed into Florida, specifically aimed at individuals bound by confidentiality agreements with Mr. Lindberg, a Florida resident. These communications were deliberately calculated to induce breaches of contracts involving a Florida resident and to undermine protected Florida interests concerning the privacy and welfare of minor children residing in Florida. The March 18, 2026 communication from Defendant Saad to an egg donor (attached as Exhibit A) is exemplary of such conduct.

***Jurisdiction Over Defendant Molina***

19. This Court has personal jurisdiction over Defendant Molina under Section 48.193(1)(a)(2), Florida Statutes, as Molina committed tortious acts within Florida through communications directed into the state that form the basis of the causes of action alleged herein.

20. Molina was previously a resident of Florida during her relationship with Mr. Lindberg and the period during which she executed the Relationship Agreement containing express confidentiality obligations. She accessed confidential information regarding Mr. Lindberg's business operations, egg donors, gestational carriers, and family planning arrangements while residing in Florida.

21. Molina's tortious conduct—including the disclosure of confidential information to media entities and, upon information and belief, to the Production Defendants—was directed at Mr. Lindberg, a Florida resident, and at contractual relationships governed by Florida law. These disclosures caused injury in Florida to Mr. Lindberg's Florida-based contractual relationships, his privacy interests, and the welfare of his minor children who reside in Florida.

22. Additionally, this Court has personal jurisdiction over Molina under Section 48.193(1)(a)(7), Florida Statutes, as the causes of action arise from Molina's breach of a contract in this state by failing to perform acts required by the Relationship Agreement to be performed in this state, specifically the obligation to maintain the confidentiality of information obtained while residing in Florida concerning a Florida resident.

***Jurisdiction Over Defendants Raw and Ingles Under the Conspiracy Theory of Jurisdiction***

23. This Court has personal jurisdiction over Defendants Raw and Ingles under Section 48.193(1)(a)(2), Florida Statutes, pursuant to the conspiracy theory of personal jurisdiction recognized under Florida law.

24. The Florida Supreme Court in Execu-Tech Business Systems, Inc. v. New Oji Paper Co., Ltd., 752 So. 2d 582 (Fla. 2000), held that Florida courts may exercise personal jurisdiction over foreign defendants, including defendants located outside the United States, based on their participation in a civil conspiracy where at least one co-conspirator has committed tortious acts in Florida in furtherance of the conspiracy. The Supreme Court expressly approved the approach in Wilcox v. Stout, 637 So. 2d 335 (Fla. 2d DCA 1994), which applied the conspiracy theory of jurisdiction under Florida's long-arm statute.

25. Florida's District Courts of Appeal have continued to apply this doctrine. In Amersham Enterprises, Inc. v. Hakim-Daccach, 333 So. 3d 289 (Fla. 3d DCA 2022), the Third District affirmed the exercise of personal jurisdiction over foreign defendants based on their participation in a conspiracy that involved tortious acts directed at Florida. Most recently, in Alexander v. Trump, 404 So. 3d 425 (Fla. 4th DCA 2025), the Fourth District held that the trial court properly exercised personal jurisdiction over eighteen nonresident defendants based on their knowing participation in a civil conspiracy with a Florida-resident defendant, applying the conspiracy theory of jurisdiction under Florida's long-arm statute.

26. Under the conspiracy theory of jurisdiction as recognized by Florida courts, acts of a co-conspirator performed in Florida in furtherance of the conspiracy may be attributed to other members of the conspiracy for purposes of establishing personal jurisdiction, even where the remote co-conspirator had no other direct contacts with Florida.

27. Here, the Production Defendants—Saad, All Rise, Center Drive, Raw, and Ingles—together with Defendant Molina, have engaged in a coordinated scheme to solicit breaches of Mr. Lindberg's confidentiality agreements with his egg donors in order to obtain protected information for use in documentary production(s) concerning Mr. Lindberg and his family. The scheme is animated by the shared objective of producing salable documentary content for premium U.S. streaming platforms by penetrating, and inducing breaches of, the NDAs that protect Mr. Lindberg and his minor children in Florida.

28. Defendants Raw and Ingles knowingly joined this conspiracy by soliciting Defendant Molina—Mr. Lindberg's former intimate partner and the mother of five of his children, who executed the Relationship Agreement while residing in Florida—to breach her confidentiality obligations and to disclose confidential information concerning Mr. Lindberg, his egg donors, and his family planning arrangements, in order to produce a documentary marketable to U.S. streaming platforms with audiences in Florida.

29. As evidenced by communications publicly disclosed by Molina on or about April 17, 2026 (attached hereto as Exhibit B), Defendant Ingles, on behalf of Defendant Raw,

repeatedly contacted Molina stating, among other things: “At Raw, we have strong relationships with the top U.S. streamers, and should you ever wish to explore your story with us, we feel confident in helping it reach a wide and global audience” and “We’re still very keen to speak with you for our documentary project, so please do feel free to get in touch if you’d ever like to pick things up.”

30. Overt acts in furtherance of the conspiracy have been committed by co-conspirators within Florida, including without limitation: (a) communications directed into Florida by Defendant Saad, soliciting Florida-connected egg donors bound by Mr. Lindberg’s Confidentiality Agreements (see Exhibit A); (b) communications directed into Florida by Defendant Molina during her Florida residency in breach of her contractual confidentiality obligations; (c) the continuing performance, in Florida, of contracts (the NDAs and the Relationship Agreement) that Defendants seek to induce breaches of; and (d) the targeting for commercial exploitation of Florida-resident Mr. Lindberg and his Florida-resident minor children.

31. Defendants Raw and Ingles knew, or reasonably should have known, that: (a) Molina’s confidentiality obligations and the egg donors’ NDAs concerned a Florida resident (Mr. Lindberg) and were governed by Florida law; (b) documentary content derived from induced breaches of those agreements would be published to U.S. streaming platforms with substantial audiences in Florida; and (c) the injury flowing from any successful inducement would be suffered principally in Florida, where Mr. Lindberg and his minor children reside.

32. The solicitation of Molina by Raw and Ingles was a direct and foreseeable component of the broader scheme to penetrate Mr. Lindberg’s Florida-based contractual confidentiality structure. Raw’s and Ingles’s acts were undertaken with knowledge that their efforts would have a substantial effect in Florida and with the specific purpose of obtaining, through an intermediary (Molina), information protected by contracts centered in Florida.

33. Additionally, Raw has purposefully availed itself of the U.S. market, including Florida, by marketing its documentary productions to, and distributing its documentary productions through, the “top U.S. streamers,” which streamers distribute content in

Florida. Raw's own public representations, as reflected in the Ingles communication (Exhibit B), confirm Raw's intent and practice of reaching U.S. audiences, including Florida audiences, with its documentary output.

34. The exercise of jurisdiction over all Defendants satisfies constitutional due process requirements. Each Defendant has purposefully availed itself of the privilege of conducting activities in Florida—either directly (Saad, Molina), through conduct directed at Florida (All Rise, Center Drive), or through knowing participation in a civil conspiracy with co-conspirators whose overt acts were directed at, and occurred within, Florida (Raw, Ingles). As the Fourth District recently held in Alexander v. Trump, 404 So. 3d 425 (Fla. 4th DCA 2025), where a nonresident defendant knowingly participates in a civil conspiracy with a resident defendant, and tortious acts in furtherance of the conspiracy are committed in Florida, the exercise of personal jurisdiction over the nonresident co-conspirator is consistent with due process.

## GENERAL ALLEGATIONS

### *The Protected Contractual Relationships*

35. Mr. Lindberg has entered into valid and enforceable confidentiality agreements with multiple egg donors ("Confidentiality Agreements" or "NDAs") in connection with assisted reproductive services.

36. These Confidentiality Agreements constitute protected business relationships under Florida law, evidencing "an actual and identifiable understanding or agreement" between Mr. Lindberg and the egg donors. Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 815 (Fla. 1994).

37. The Confidentiality Agreements contain express provisions prohibiting the egg donors from disclosing any information regarding: (a) their role as egg donors for Mr. Lindberg; (b) financial arrangements and compensation; (c) personal information about Mr. Lindberg or his family; (d) the existence and terms of the agreements themselves; (e) medical information related to the assisted reproductive services; and (f) information regarding embryos, reproductive materials, and related arrangements.

38. Mr. Lindberg provided valuable consideration for these Confidentiality Agreements, including monetary compensation and other benefits.

39. These agreements serve legitimate purposes, including protecting Mr. Lindberg's privacy interests, protecting his minor children from unwanted publicity, and maintaining the confidentiality of sensitive family matters.

40. The confidential information protected by the NDAs—including the identities of the egg donors, the terms of their arrangements, financial details, medical information, and personal information about Mr. Lindberg's family—derives independent economic value from not being generally known or readily ascertainable by proper means. Mr. Lindberg has made reasonable efforts to maintain its secrecy through the execution of comprehensive confidentiality agreements.

***Molina's Confidentiality Obligations***

41. In addition to the egg donor NDAs, Mr. Lindberg's former girlfriend, Defendant Molina, executed a Revised Relationship Agreement dated November 12, 2023, which created express confidentiality obligations regarding information she obtained during their relationship.

42. During her relationship with Mr. Lindberg from approximately 2019 through 2024, Molina gained access to highly confidential and sensitive information concerning: (a) Mr. Lindberg's business operations; (b) personal communications between Mr. Lindberg and his legal and management teams; (c) the identities of egg donors and gestational carriers; (d) the terms of confidentiality agreements between Mr. Lindberg and his egg donors; (e) contact information for egg donors and gestational carriers; (f) financial details of Mr. Lindberg's arrangements with egg donors; and (g) medical information related to assisted reproductive services.

43. Molina was aware that Mr. Lindberg's relationships with egg donors and gestational carriers were governed by confidentiality agreements and involved sensitive personal and medical information protected under Florida privacy laws.

44. Under the Relationship Agreement and Florida common law, Molina owed Mr. Lindberg express and implied duties of confidentiality regarding the private information she obtained during their relationship, particularly information relating to his business affairs, his egg donors and gestational carriers, and personal medical decisions.

***Mr. Lindberg's Family and the Purpose of Confidentiality***

45. Mr. Lindberg is the father of twelve (12) children, including five children with Defendant Molina. He comes from a large family tradition—his grandmother came from a family of 13, and he comes from a family of 6—and following his divorce in 2017, he wanted to continue expanding his family.

46. With the assistance of modern fertility treatments and IVF, Mr. Lindberg was able to have additional children, working with a number of egg donors and gestational carriers over several years.

47. The primary purpose of the Confidentiality Agreements has always been to protect the children whose lives were made possible through assisted reproductive services.

48. These children are thriving; they are healthy, happy, and growing in wonderful ways. They receive exceptional education and live in peaceful surroundings filled with nature, animals, and calm.

49. The Confidentiality Agreements were specifically designed to protect these children's privacy, safety, and future well-being from exploitation and unwanted intrusion into the most private aspects of their lives.

***The Existing Media Campaign and Related Litigation***

50. National news stories have been published about Mr. Lindberg's large family, including sensationalized pieces designed to attract attention rather than portray the truth.

51. Mr. Lindberg has already been compelled to file a federal lawsuit in the United States District Court for the Middle District of Florida, Orlando Division, captioned Lindberg v. This Machine Filmworks, LLC, Case No. 6:25-cv-02370-CEM-DCI (the "Federal Action"), against another production company that engaged in similar tortious conduct—

offering $20,000 to an egg donor bound by an NDA to induce her to breach that NDA and participate in a documentary about Mr. Lindberg's family.

52. In the Federal Action, Mr. Lindberg's Second Amended Complaint specifically alleges that This Machine Filmworks "contacted Olivia Molina, Mr. Lindberg's former girlfriend, seeking to obtain confidential information about Mr. Lindberg and his family arrangements." This establishes that Defendant Molina has been in contact with documentary producers seeking to exploit Mr. Lindberg's private family matters.

53. Mr. Lindberg has also filed a separate action against Molina in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 2025-014566-CA-01, alleging defamation, tortious interference with contract, breach of confidentiality, and intentional infliction of emotional distress arising from Molina's disclosure of false and confidential information to Bloomberg L.P.

54. The filing of this First Amended Complaint arises from newly discovered evidence demonstrating that the campaign to solicit breaches of Mr. Lindberg's confidentiality agreements is broader than originally understood and involves additional actors—including Defendants Raw, Ingles, and Molina acting in coordination with the other Production Defendants—to achieve the same unlawful objectives.

***Molina's Role as Source of Confidential Information to the Production Defendants***

55. Upon information and belief, Defendant Molina has been in contact with one or more of the Production Defendants and has provided confidential information about Mr. Lindberg's egg donors, including their identities, contact information, and the nature of their relationships with Mr. Lindberg—all of which is protected by the Confidentiality Agreements and the Relationship Agreement.

56. The evidence supports this conclusion. In the Federal Action, egg donor Ellen Alexander's February 10, 2026 email to Mr. Lindberg states that when she received the $20,000 offer from This Machine Filmworks' producers, she believed the money might be from "someone like Stephanie/Olivia, someone who used to work for you." Ms. Alexander's immediate association of "Olivia"—Defendant Molina—with the

documentary production effort demonstrates that Molina's involvement in the campaign to solicit egg donor breaches was known or reasonably anticipated by persons familiar with Mr. Lindberg's arrangements.

57. Further evidence of Molina's role as an information conduit is found in Defendant Saad's March 18, 2026 communication (attached hereto as Exhibit A). In that communication, Saad demonstrates detailed knowledge of the identity of a specific egg donor ("Leia"), her role as an egg donor for Mr. Lindberg, and her contact information. The only way the Production Defendants could have obtained this information is through a person who had insider access to Mr. Lindberg's confidential arrangements—and Molina is the most likely such source, given her five-year intimate relationship with Mr. Lindberg and her documented hostility toward him following their separation.

58. Molina's motivation to assist the Production Defendants is well established. As documented in the Miami-Dade County litigation (Case No. 2025-014566-CA-01) and the Hillsborough County family court proceedings (Case No. 25-DR-004042), Molina has engaged in a sustained campaign of retaliation against Mr. Lindberg following the end of their relationship, including: (a) providing false and defamatory information to Bloomberg L.P. reporters; (b) making defamatory statements on social media platforms including Instagram and TikTok; (c) threatening to "damage his image forever"; (d) engaging in parental alienation by telling one of the children that "Daddy only wants to hurt Mommy"; and (e) making statements demonstrating financial rather than child-focused motivations, including "I need money not kids."

59. Upon information and belief, Molina's disclosure of confidential information to the Production Defendants was motivated by the same retaliatory animus and was intended to harm Mr. Lindberg's reputation, undermine his contractual relationships, and gain strategic advantage in the ongoing family court proceedings.

***Defendant Saad's Wrongful Conduct: The March 18, 2026 Communication***

60. On March 18, 2026, Defendant Alana Saad sent a written communication (attached hereto as Exhibit A) to an individual identified as "Leia," who is one of Mr. Lindberg's egg donors and is bound by a Confidentiality Agreement with Mr. Lindberg.

61. In her communication, Saad identified herself as "an Emmy-winning documentary producer" and stated that she is "creating a premium documentary for a major streamer with Jeff Zimbalist (All Rise Films) and Center Drive Media regarding Greg Lindberg and his 'baby project' of creating as many children as possible through IVF."

62. Saad's communication explicitly identifies the U.S.-based Production Defendants as co-producing the documentary at issue: Saad personally, Jeff Zimbalist through All Rise Films, and Center Drive Media.

63. Saad's communication demonstrates actual knowledge that "Leia" donated her eggs for Mr. Lindberg. Saad states: "I learned that you donated your eggs for Greg." This establishes that Defendants had already conducted investigation sufficient to identify Mr. Lindberg's egg donors by name and contact information—information that is itself protected by the Confidentiality Agreements.

64. Critically, Saad states that she "learned" of Leia's identity as an egg donor through interviews that the Production Defendants had "begun filming." Saad writes: "We've begun filming interviews, and through those I learned that you donated your eggs for Greg." This confirms that another individual has already breached a duty of confidentiality to Mr. Lindberg by disclosing the identity of his egg donors to the Production Defendants. Upon information and belief, Defendant Molina is the source—or one of the sources—of this confidential information.

65. Saad's communication acknowledges the intimate and private nature of the information she seeks: "I know this is super intimate topic you probably never thought would turn into this." This statement demonstrates Defendants' awareness that they are seeking to intrude into the most private aspects of the egg donors' and Mr. Lindberg's lives.

66. Saad's communication employs manipulative framing designed to pressure the egg donor to breach her contractual obligations. Saad states: "I think it's important for women not to be silenced anymore than we have." This language is calculated to recharacterize a voluntary, bargained-for confidentiality agreement as an act of "silencing," thereby pressuring the egg donor into believing that honoring her contractual obligations is somehow morally wrong.

67. Saad's communication was sent into Florida, directed at an individual bound by a Florida-related contract with a Florida resident, for the express purpose of inducing a breach of that contract.

68. Saad's communication characterizes Mr. Lindberg's family as a "baby project" of "creating as many children as possible," which is a dehumanizing and sensationalized characterization of Mr. Lindberg's decision to build a large family through assisted reproductive technology. This language reveals the commercial and exploitative nature of Defendants' documentary project.

69. Upon information and belief, the communication attached as Exhibit A is not an isolated incident. The U.S.-based Production Defendants have engaged in a systematic campaign to contact and solicit multiple egg donors bound by confidentiality agreements with Mr. Lindberg.

***Defendants Raw and Ingles's Wrongful Conduct: Solicitation of Defendant Molina***

70. On information and belief, at multiple points during 2025 and 2026, Defendant Georgia Ingles, acting on behalf of and within the scope of her employment by or agency for Defendant Raw, sent written electronic communications to Defendant Olivia Molina. These communications are attached hereto as Exhibit B.

71. In the communications attached as Exhibit B, Ingles introduced Raw to Molina and solicited Molina's participation in a documentary project concerning Mr. Lindberg, his family, his egg donors, and/or his children. Ingles stated to Molina: "At Raw, we have strong relationships with the top U.S. streamers, and should you ever wish to explore your story with us, we feel confident in helping it reach a wide and global audience." She further provided her direct contact information: "you can reach me directly at: georgia.ingles@raw.co.uk."

72. In subsequent communications, Ingles continued to pursue Molina, writing: "Hi Olivia, I hope you're really well. Just wanted to check in and see how things are going on your end. We're still very keen to speak with you for our documentary project, so please do feel free to get in touch if you'd ever like to pick things up. Thanks!"

73. Ingles's communications to Molina demonstrate that Raw and Ingles knew, or reasonably should have known, that: (a) Molina was a former intimate partner of Mr. Lindberg, a Florida resident; (b) Molina had access to confidential information concerning Mr. Lindberg, his business affairs, his egg donors, and his gestational carriers; (c) such information was governed by contractual and common-law confidentiality obligations running to Mr. Lindberg in Florida; and (d) any documentary produced from such information would necessarily require Molina's breach of her confidentiality obligations.

74. Molina's own responses to Ingles, publicly disclosed by Molina on or about April 17, 2026, confirm that Molina understood the solicitation to concern Mr. Lindberg's egg donors and children. Molina responded: "Honestly I am not interested in talking about egg donors or children, that's why I didn't want to talk to Bloomberg reporters. I think everyone can easily take everything out of context or make assumptions. What people do with their lives or what they do to try have children is really none of my business." Molina further stated: "I'm not on Greg's side but I do know there were many lies in that article."

75. Raw's and Ingles's solicitation of Molina was undertaken for the purpose of inducing Molina to breach the Relationship Agreement and her common-law confidentiality duties so that Raw could obtain, for commercial exploitation via U.S. streaming platforms, information protected by the Relationship Agreement and by the egg donor NDAs. Raw's express statement that it has "strong relationships with the top U.S. streamers" evidences Raw's intent to commercialize any resulting documentary in the United States, including to audiences in Florida.

76. Upon information and belief, Raw and Ingles either coordinated with, or independently joined, the same unlawful objective being pursued by Saad, All Rise, and Center Drive: namely, to produce one or more commercially salable documentaries concerning Mr. Lindberg by inducing breaches of the confidentiality agreements protecting Mr. Lindberg and his minor children. Each Production Defendant has contributed to, and benefits from, the penetration of Mr. Lindberg's Florida-centered contractual confidentiality structure.

***Defendants' Coordinated Scheme***

77. All Defendants are operating in concert toward the common unlawful objective of penetrating Mr. Lindberg's contractual confidentiality structure for commercial documentary exploitation. The U.S.-based Production Defendants are jointly producing a documentary, as Saad's March 18, 2026 communication expressly confirms. Raw and Ingles have independently solicited Molina for a substantially similar documentary project, leveraging the same pool of confidential information and the same NDA-bound individuals. Defendant Molina is providing—or has provided—the confidential information that enables the Production Defendants to identify and target egg donors bound by NDAs with Mr. Lindberg.

78. Upon information and belief, Defendants have agreed among themselves, or have acted with knowledge of and in furtherance of a common plan, to solicit breaches of Mr. Lindberg's confidentiality agreements in order to obtain protected information for use in documentary production and to harm Mr. Lindberg.

79. Upon information and belief, Defendants' campaign has involved and may continue to involve offering financial inducements to egg donors and to Molina to breach their confidentiality agreements, consistent with the pattern established in the Federal Action against This Machine Filmworks, LLC, where a $20,000 payment was offered to an egg donor in exchange for her participation.

80. Defendants' conduct in soliciting egg donors, Molina, and other NDA-bound individuals to participate in interviews about Mr. Lindberg creates legal exposure for those individuals themselves, as such participation would constitute breaches of their non-disclosure agreements. Defendants' willing creation of this legal jeopardy for third parties further demonstrates the unjustified nature of their interference.

## COUNT I

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

## (Against All Defendants)

81. Plaintiff realleges and incorporates by reference all paragraphs above as if fully set forth herein.

82. Under Florida law, the elements of tortious interference with a contractual or advantageous business relationship are: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result. Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994) (quoting Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985)).

83. **Element One: Existence of a Business Relationship.** Valid and enforceable Confidentiality Agreements exist between Mr. Lindberg and his egg donors, including the egg donor identified as "Leia" who was specifically targeted by Defendant Saad in the March 18, 2026 communication (Exhibit A). In addition, Defendant Molina is contractually bound by the Revised Relationship Agreement dated November 12, 2023. These NDAs and the Relationship Agreement constitute protected business relationships under Florida law. Ethan Allen, 647 So. 2d at 815.

84. **Element Two: Defendants' Knowledge.** Each Defendant has actual or constructive knowledge of Mr. Lindberg's Confidentiality Agreements and of the Relationship Agreement. The U.S.-based Production Defendants' knowledge is demonstrated by Saad's communication (Exhibit A), which shows they have obtained detailed information about the identity of specific egg donors and the nature of their relationships with Mr. Lindberg. Raw's and Ingles's knowledge is demonstrated by Ingles's deliberate targeting of Molina as a source of information concerning Mr. Lindberg's egg donors and children (Exhibit B), which Raw and Ingles knew or reasonably should have known to be subject to confidentiality obligations. Defendant Molina's knowledge is even more direct: she had firsthand knowledge of Mr. Lindberg's confidentiality agreements with egg donors and gestational carriers, gained through her five-year intimate relationship with Mr. Lindberg, and she personally executed the Relationship Agreement. Furthermore, the existence of the NDAs is a matter of public record through the Federal Action.

85. **Element Three: Intentional and Unjustified Interference.** Each Defendant has intentionally and unjustifiably interfered with Mr. Lindberg's contractual relationships:

a. The U.S.-based Production Defendants (Saad, All Rise, and Center Drive) have solicited egg donors to breach their Confidentiality Agreements through communications directed into Florida. Saad's March 18, 2026 communication (Exhibit A) is a direct, targeted solicitation of an egg donor to participate in a documentary—participation that would necessarily require the disclosure of information protected by the NDA. Saad's use of manipulative framing ("I think it's important for women not to be silenced anymore than we have") demonstrates a deliberate strategy to overcome the egg donor's contractual obligations through emotional pressure.

b. Defendants Raw and Ingles have solicited Molina to breach the Relationship Agreement and her common-law confidentiality duties through repeated written communications (Exhibit B). Those solicitations expressly sought Molina's participation in "our documentary project" concerning Mr. Lindberg's family—participation that would necessarily require Molina to disclose information protected by the Relationship Agreement. Raw's representation that it has "strong relationships with the top U.S. streamers" was calculated to induce Molina to breach her obligations by offering the prospect of a "wide and global audience" for her story.

c. Defendant Molina has, upon information and belief, disclosed the identities and contact information of Mr. Lindberg's egg donors to one or more of the Production Defendants and/or to Bloomberg reporters, thereby enabling and facilitating the Production Defendants' targeted solicitation of those egg donors. Molina's disclosures constitute independent acts of tortious interference with Mr. Lindberg's contractual relationships with his egg donors, as Molina knew of the NDAs, intentionally disclosed information that would enable third parties to solicit breaches of those NDAs, and acted without justification.

86. Defendants' interference is unjustified because it employs methods that are independently tortious. Upon information and belief, Defendants' campaign has involved or will involve offering financial inducements to egg donors and/or to Molina to breach their

confidentiality obligations, consistent with the $20,000 payment offered by This Machine Filmworks to egg donor Ellen Alexander as established in the Federal Action.

87. **Element Four: Damages.** As a direct and proximate result of Defendants' tortious interference, Mr. Lindberg has suffered and continues to suffer damages, including but not limited to:

   d. Loss of the benefit of his bargained-for confidentiality;

   e. Invasion of privacy;

   f. Emotional distress;

   g. Damage to personal and family relationships;

   h. Loss of the value of consideration paid for the Confidentiality Agreements;

   i. Risk of irreparable harm to his nine minor children's privacy, safety, and future well-being;

   j. Damage to his children's educational environment and home school program;

   k. Interference with Mr. Lindberg's ability to be deeply involved in his children's lives; and

   l. Other consequential damages.

88. Under Florida law, Mr. Lindberg is entitled to the damages reasonably flowing from Defendants' interference with his contractual relationships.

89. Defendants' conduct was intentional, malicious, and in reckless disregard of Mr. Lindberg's rights and the welfare of twelve innocent children, entitling him to punitive damages under Florida law.

WHEREFORE, Plaintiff requests judgment against all Defendants, jointly and severally, for compensatory damages, punitive damages, costs of the suit, and any other relief as the court deems proper.

## COUNT II

## VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT

**(Fla. Stat. §§ 688.001–688.009)**

**(Against All Defendants)**

90. Plaintiff realleges and incorporates by reference all paragraphs above as if fully set forth herein.

91. The Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. §§ 688.001–688.009, provides a cause of action for the misappropriation of trade secrets.

92. FUTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Fla. Stat. § 688.002(1).

93. "Misappropriation" under FUTSA includes the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Fla. Stat. § 688.002(2)(a).

94. The confidential information protected by Mr. Lindberg's NDAs and the Relationship Agreement—including the identities of the egg donors, the terms of their arrangements, financial details, medical information, and personal information about Mr. Lindberg's family—constitutes protectable trade secrets or confidential business information under FUTSA.

95. This information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Fla. Stat. § 688.002(4)(a). The economic value of this information is demonstrated by, among other things, the $20,000 that a related production entity (This Machine Filmworks) was willing to pay to obtain similar information, and by the commercial value Defendants expect to derive from "a premium documentary for a major streamer" (Exhibit A) and a documentary intended for "the top U.S. streamers" with a "wide and global audience" (Exhibit B).

96. Mr. Lindberg has made reasonable efforts to maintain the secrecy of this information through the execution of comprehensive confidentiality agreements with egg donors and the Relationship Agreement with Molina. Fla. Stat. § 688.002(4)(b).

97. **Misappropriation by the U.S.-Based Production Defendants.** Defendants Saad, All Rise, and Center Drive's solicitation of egg donors to breach their NDAs and disclose protected information constitutes "inducement of a breach of a duty to maintain secrecy"—one of the specific categories of "improper means" enumerated in FUTSA. Fla. Stat. § 688.002(1). The March 18, 2026 communication from Saad (Exhibit A) is direct evidence of this inducement. Additionally, those Defendants' acquisition of trade secret information from Molina—specifically, the identities and contact information of egg donors—constitutes misappropriation under Fla. Stat. § 688.002(2)(a), as those Defendants knew or had reason to know that this information was acquired through breach of a duty to maintain secrecy.

98. **Misappropriation by Raw and Ingles.** Defendants Raw and Ingles's repeated solicitation of Molina to breach the Relationship Agreement and her common-law confidentiality duties likewise constitutes "inducement of a breach of a duty to maintain secrecy" under Fla. Stat. § 688.002(1). The communications attached as Exhibit B are direct evidence of this inducement. To the extent Molina has transmitted any trade secret information to Raw or Ingles, Raw and Ingles have committed misappropriation under Fla. Stat. § 688.002(2)(a) by acquiring such information with knowledge or reason to know of Molina's underlying breach.

99. **Misappropriation by Molina.** Molina's disclosure of Mr. Lindberg's confidential information—including the identities and contact information of egg donors—to one or more of the Production Defendants and/or Bloomberg L.P. constitutes "breach … of a duty to maintain secrecy," which is an independent category of "improper means" under Fla. Stat. § 688.002(1). Molina's duty to maintain secrecy arises from the Relationship Agreement, from Florida common law, and from her knowledge that the information she disclosed was subject to the egg donor NDAs.

100. Defendants' misappropriation was willful and malicious, entitling Mr. Lindberg to exemplary damages not exceeding twice the compensatory award, as well as reasonable attorney's fees. See Fla. Stat. §§ 688.004(2), 688.005.

101. FUTSA authorizes injunctive relief to prevent actual or threatened misappropriation of trade secrets. Fla. Stat. § 688.003. Mr. Lindberg is entitled to an injunction prohibiting Defendants from continuing to use improper means to acquire his confidential information.

WHEREFORE, Plaintiff requests judgment against all Defendants, jointly and severally, for compensatory damages, exemplary damages, attorney's fees, injunctive relief, and any other relief as the court deems proper.

## COUNT III

## CIVIL CONSPIRACY

**(Against All Defendants)**

102. Plaintiff realleges and incorporates by reference all paragraphs above as if fully set forth herein.

103. Under Florida law, a civil conspiracy requires: (a) an agreement between two or more parties; (b) to do an unlawful act or to do a lawful act by unlawful means; (c) the doing of some overt act in pursuance of the conspiracy; and (d) damage to the plaintiff as a result of the acts done under the conspiracy. Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997); Walters v. Blankenship, 931 So. 2d 137, 140 (Fla. 5th DCA 2006).

104. **Agreement.** Saad's March 18, 2026 communication (Exhibit A) constitutes direct evidence of an agreement among Saad, All Rise, and Center Drive to jointly produce a documentary concerning Mr. Lindberg's family. Saad explicitly states she is "creating a premium documentary for a major streamer with Jeff Zimbalist (All Rise Films) and Center Drive Media." Upon information and belief, Defendants Raw and Ingles, through coordinated or parallel action sharing a common unlawful objective, have joined the same overarching conspiracy to penetrate Mr. Lindberg's confidentiality structure for

documentary exploitation. Molina, in turn, has joined the conspiracy by providing the Production Defendants with confidential information about Mr. Lindberg's egg donors, their identities, and their contact information, knowing that such information would be used to solicit breaches of the NDAs, and by entertaining and responding to Production Defendants' solicitations as evidenced in Exhibit B.

105. **Unlawful Act or Unlawful Means.** Defendants conspired to commit the unlawful acts of tortious interference with Mr. Lindberg's contractual relationships and misappropriation of trade secrets in violation of FUTSA. The underlying torts—tortious interference (Count I) and trade secret misappropriation (Count II)—provide the independent actionable wrongs required to sustain the civil conspiracy claim.

106. **Overt Acts.** Multiple overt acts have been committed in furtherance of the conspiracy, including but not limited to:

m. Saad's March 18, 2026 communication to "Leia" soliciting her participation in the documentary (Exhibit A), directed into Florida;

n. Ingles's communications on behalf of Raw soliciting Molina's participation in a documentary project concerning Mr. Lindberg's egg donors and children (Exhibit B);

o. The identification of egg donors bound by NDAs with Mr. Lindberg;

p. The acquisition of egg donors' contact information through improper means;

q. Molina's disclosure of confidential information about Mr. Lindberg's egg donors to one or more Production Defendants and/or Bloomberg L.P.;

r. Molina's disclosure of false and defamatory information to Bloomberg L.P. for the purpose of creating a sensationalized media narrative that would facilitate the documentary production;

s. The filming of interviews by the U.S.-based Production Defendants in which confidential information about Mr. Lindberg's egg donors was disclosed; and

t. Additional communications directed at other egg donors and at Molina soliciting their participation in documentary content concerning Mr. Lindberg.

107. There is no requirement that each co-conspirator commit acts in furtherance of the conspiracy; it is sufficient if each conspirator knows of the scheme and assists in some way. Charles v. Fla. Foreclosure Placement Ctr., LLC, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008). Each Defendant's participation in the coordinated scheme—whether through producing a documentary, soliciting egg donors, soliciting Molina, or providing confidential information—renders each co-conspirator jointly liable for the tortious acts of the others.

108. **Damages.** As a direct and proximate result of Defendants' conspiracy, Mr. Lindberg has suffered and continues to suffer the damages set forth above in this Complaint, which are incorporated herein by reference.

WHEREFORE, Plaintiff requests judgment against all Defendants, jointly and severally, for compensatory damages, punitive damages, costs of the suit, and any other relief as the court deems proper.

## COUNT IV

## BREACH OF CONFIDENTIALITY AGREEMENT

### (Against Defendant Molina)

109. Plaintiff realleges and incorporates by reference all paragraphs above as if fully set forth herein.

110. Defendant Molina executed a Revised Relationship Agreement dated November 12, 2023, which created express confidentiality obligations that are enforceable under Florida contract law.

111. Under the Relationship Agreement, Molina was obligated to maintain the confidentiality of information she obtained during her relationship with Mr. Lindberg, including but not limited to: (a) the identities of Mr. Lindberg's egg donors and gestational carriers; (b) the terms of confidentiality agreements between Mr. Lindberg and third parties; (c) contact information for egg donors and gestational carriers; (d) financial details of Mr. Lindberg's arrangements; (e) medical information related to

assisted reproductive services; and (f) personal information about Mr. Lindberg's family and business operations.

112. Additionally, under Florida common law, Molina owed implied duties of confidentiality arising from the nature of her relationship with Mr. Lindberg and her access to privileged and confidential information.

113. Defendant Molina materially breached her confidentiality obligations by:

u. Disclosing the identities and contact information of Mr. Lindberg's egg donors to one or more Production Defendants and/or their agents, enabling them to target those egg donors for participation in a documentary;

v. Disclosing confidential information about Mr. Lindberg's family planning arrangements, egg donor relationships, and business operations to Bloomberg L.P. reporters;

w. Disclosing confidential information about Mr. Lindberg's contractual arrangements, including the existence and terms of his NDAs with egg donors; and

x. Disclosing privileged attorney-client communications and other confidential business information she obtained during the relationship.

114. Molina's breaches were willful, deliberate, and intended to cause maximum harm to Mr. Lindberg for purposes of retaliation and gaining advantage in the ongoing Hillsborough County family court litigation.

115. As a direct and proximate result of Defendant Molina's breach of her confidentiality obligations, Mr. Lindberg has suffered damages in excess of $3,000,000, including but not limited to: (a) loss of the secrecy and value of confidential information; (b) invasion of privacy; (c) reputational harm; (d) emotional distress; (e) interference with business relationships; (f) loss of the benefit of his bargained-for confidentiality with egg donors, whose NDAs have been undermined by Molina's disclosures; and (g) harm to the privacy and welfare of his twelve minor children.

WHEREFORE, Plaintiff requests judgment against Defendant Molina for compensatory damages, punitive damages, costs of the suit, and any other relief as the court deems proper.

## COUNT V

## DEFAMATION

## (Against Defendant Molina)

116. Plaintiff realleges and incorporates by reference all paragraphs above as if fully set forth herein.

117. Defendant Molina made false and defamatory statements concerning Mr. Lindberg to Bloomberg L.P. and its reporters, which statements were subsequently published to third parties in December 2024 articles that have been widely circulated and republished.

118. The false and defamatory statements provided by Molina to Bloomberg included, but were not limited to: (a) the false claim that Mr. Lindberg selected egg donors exclusively based on physical appearance criteria such as eye color; (b) false implications that Mr. Lindberg deceived women into donating eggs; (c) false statements suggesting that Mr. Lindberg misled egg donors about payment terms and treatment; and (d) false characterizations of Mr. Lindberg's family planning decisions as unethical.

119. These statements constitute defamation per se under Florida law because they falsely impute to Mr. Lindberg conduct incompatible with his business and profession, specifically suggesting he committed fraudulent or unethical acts in his business dealings.

120. Molina knew these statements were false because of her intimate knowledge of Mr. Lindberg's actual practices and relationships with egg donors and gestational carriers, which she had observed firsthand during their five-year relationship. Molina made these statements with actual malice, knowing them to be false or acting with reckless disregard for their truth or falsity.

121. In addition to the disclosures to Bloomberg, Molina has engaged in a broader pattern of defamatory conduct through social media platforms including Instagram and

TikTok, WhatsApp communications, emails, and direct statements to the parties' children, as documented in the Hillsborough County family court proceedings (Case No. 25-DR-004042). These additional false and defamatory statements include, among others: (a) statements portraying Mr. Lindberg as abusive, neglectful, or exploitative; (b) threats to "damage his image forever"; and (c) telling one of the children that "Daddy only wants to hurt Mommy," thereby engaging in parental alienation while defaming Mr. Lindberg to his own child.

122. Molina's motivation was to harm Mr. Lindberg's reputation, gain strategic advantage in the Hillsborough County family court proceedings, and facilitate the documentary production by creating a sensationalized media narrative.

123. As a direct and proximate result of Defendant Molina's defamatory statements, Mr. Lindberg has suffered damages in excess of $15,000,000, including reputational harm, loss of business opportunities, emotional distress, and damage to his relationships with his children.

WHEREFORE, Plaintiff demands judgment against Defendant Molina for compensatory damages, punitive damages, costs of the suit, and any other relief as the court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Greg E. Lindberg respectfully requests that this Court:

y. Enter judgment in favor of Plaintiff and against all Defendants on all applicable Counts;

z. Award Plaintiff compensatory damages in an amount exceeding Twenty-Five Million Dollars ($25,000,000.00), the exact amount to be proven at trial;

aa. Upon proper showing, award Plaintiff punitive damages in an amount to be determined at trial;

bb. Award Plaintiff exemplary damages under FUTSA, Fla. Stat. § 688.004(2), not to exceed twice any compensatory award for Defendants' willful and malicious misappropriation;

cc. Enter a permanent injunction prohibiting Defendants from further contacting or attempting to induce Mr. Lindberg's egg donors, gestational carriers, or Defendant Molina to breach their Confidentiality Agreements or the Relationship Agreement;

dd. Enter a permanent injunction prohibiting Defendants from using improper means, including bribery or inducement of breach of a duty to maintain secrecy, to acquire Mr. Lindberg's confidential information and trade secrets, pursuant to Fla. Stat. § 688.003;

ee. Enter a permanent injunction prohibiting Defendants from producing, distributing, or broadcasting any "documentary" or media content derived from information obtained through Defendants' improper inducement of breaches of the Confidentiality Agreements or the Relationship Agreement;

ff. Enter a permanent injunction prohibiting Defendant Molina from further disclosing any confidential information obtained during her relationship with Mr. Lindberg in violation of the Relationship Agreement;

gg. Award Plaintiff his reasonable attorney's fees pursuant to Fla. Stat. § 688.005 and any other applicable provision of law;

hh. Award Plaintiff his costs of this action;

ii. Award pre-judgment and post-judgment interest as allowed by law; and

jj. Grant such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Florida Rule of Civil Procedure 1.430, Plaintiff demands trial by jury on all issues so triable.

DATED: _________________, 2026

Respectfully submitted,

/s/ Greg E. Lindberg
GREG E. LINDBERG, Pro Se
P.O. Box 159
Thonotosassa, FL 33592
Tel: 1-919-308-9686
Primary Email: gelindberg@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on _______________, 2026, I served the foregoing First Amended Complaint and applicable Summonses on each Defendant by the methods indicated below:

**Alana Saad**
Greater Chicago Area, Illinois
Via personal service through process server

**All Rise Films**
1200 18th Street NW, Suite 700
Washington, DC 20036
Via personal service through process server

**Center Drive Media**
6701 Center Drive West, Suite 300
Los Angeles, California 90045
Via personal service through process server

**Raw TV Limited d/b/a Raw**
United Kingdom (address to be confirmed)
Via international service of process pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, and/or pursuant to Fla. Stat. § 48.197

**Georgia Ingles**
c/o Raw TV Limited, United Kingdom
Via international service of process pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, and/or pursuant to Fla. Stat. § 48.197

**Olivia Molina**
Málaga, Spain
Via international service of process pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, and/or pursuant to Fla. Stat. § 48.197

/s/ Greg E. Lindberg
GREG E. LINDBERG, Pro Se